## No. 23-55299

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

KEO RATHA; SEM KOSAL; SOPHEA BUN; YEM BAN; NOL NAKRY; PHAN SOPHEA; AND SOK SANG,

*Plaintiffs-Appellants*,

v.

RUBICON RESOURCES, LLC

*Defendant-Appellee*.

On Appeal from the District Court for the Central District of California, Honorable John F. Walter Presiding, Case No. 2:16-CV-04271-JFW

## APPELLANTS' OPENING BRIEF

Paul Hoffman
John Washington
SCHONBRUN SEPLOW
HARRIS HOFFMAN & ZELDES, LLP
200 Pier Ave., Suite 226
Hermosa Beach, CA 90254
(310) 396–0731

Catherine Sweetser
UCLA LAW CLINICS
385 Charles E Young Dr.
Los Angeles, CA 90095
(310) 267–5068

Agnieszka Fryszman
Nicholas J. Jacques
Emily Ray
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Ave., N.W.
Ste. 500
Washington, D.C. 20006
(202) 408–4600

Dan Stormer
HADSELL STORMER RENICK
& DAI LLP
128 N. Fair Oaks Avenue
Pasadena, CA 91103
(626) 585–9600

# **TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................1

II. STATEMENT OF JURISDICTION ...................................................3

III. STATEMENT OF ISSUES PRESENTED FOR REVIEW ...............3

IV. STATEMENT OF THE CASE .........................................................4
    A.    Procedural History............................................................4
    B.    Facts.................................................................................6
           1.    Rubicon did not contest four Plaintiffs' forced labor
                 claims ...............................................................6
           2.    Rubicon participated in a venture to sell shrimp in the
                 United States that was produced with forced labor ..................9
           3.    It is undisputed that Rubicon attempted to sell shrimp to
                 Walmart and that Walmart refused the shrimp.......................13
           4.    By the time it attempted to sell the shrimp to Walmart,
                 Rubicon knew, recklessly disregarded, and/or should
                 have known of the forced labor and other abuses....................13

V. SUMMARY OF ARGUMENT .......................................................19

VI. STANDARD OF REVIEW.............................................................22

VII. ARGUMENT .................................................................................23
    A.    The lower court's decision to deny 60(b) relief rests on legal
          errors.............................................................................23
           1.    ATRA applies to this case......................................23
                 a.    Clarification is a well-established doctrine and is
                       not subject to retroactivity analysis ................................23
                 b.    ATRA is a clarifying amendment..................................25
                     i.    Statutory background and the Court's
                         holding..............................................................25
                     ii.    Unanimous Congressional response ...................29
                     iii.    The district court erred in holding that
                         ATRA was not clarifying ....................................33
                 c.    The district court erred by alternatively holding
                     that *Plaut v. Spendthrift Farm* prohibits
                     retrospective application of the ATRA to this case........34

i

2.      The district court erred as a matter of law by holding that its legally erroneous alternative holdings independently supported the judgment ........................................................... 37

       a.      The legal basis for the district court's decision that Rubicon did not "participate" in a venture was incorrect ...................................................................... 38

       b.      The district court erred by drawing inferences against the plaintiffs and otherwise improperly discounting their substantial summary-judgment evidence regarding Rubicon's knowledge and notice of forced labor ............................................ 46

              i.      Ample evidence demonstrates Rubicon had the requisite state of mind .................................... 49

              ii.     The district court erred in holding Plaintiffs lack evidence on Rubicon's state of mind ............ 53

B.      The Court should remand with instructions to vacate the judgment ................................................................................. 59

VIII.   CONCLUSION ................................................................................. 62

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.B. v. Marriott Int'l, Inc.*,
    455 F. Supp. 3d 171 (E.D. Pa. 2020)..........................................................27, 45

*A.R. v Wyndham Hotels & Resorts*,
    2022 WL 17741054 (S.D. Ohio Dec. 16, 2022)..................................................45

*ABKCO Music, Inc. v. Lavere*,
    217 F.3d 684 (9th Cir. 2000) ......................................................24, 25, 32, 36

*Allstate Ins. Co. v. Breeden*,
    216 F. App'x 655 (9th Cir. 2007) ....................................................................37

*Baldia v. RN Express Staffing Registry*,
    633 F. Supp. 3d. 693 (S.D.N.Y 2022) ...............................................................27

*Bank Markazi v. Peterson*,
    578 U.S. 212 (2016).........................................................................................37

*Barton v. Barr*,
    140 S. Ct. 1442 (2020).....................................................................................28

*Beaver v. Tarsadia Hotels*,
    816 F.3d 1170 (9th Cir. 2016) ..............................................................24, 33, 34

*Beverly Cmty. Hosp. Ass'n v. Belshe*,
    132 F.3d 1259 (9th Cir. 1997) ..............................................................22, 25, 31

*Bistline v. Jeffs*,
    2017 WL 108039 (D. Utah Jan. 11, 2017) ........................................................44

*Bistline v. Parker*,
    918 F.3d 849 (10th Cir. 2019) .........................................................26, 41, 44, 45

*Braxton-Secret v. A.H. Robins Co.*,
    769 F.2d 528 (9th Cir. 1985) ............................................................................48

*Brown v. Marquette Sav. & Loan Ass'n*,
    686 F.2d 608 (7th Cir. 1982) ............................................................................33

*Brown v. Thompson*,
   374 F.3d 253 (4th Cir. 2004) .................................................24, 25, 31

*Buchanan v. Watkins & Letofsky, LLP*,
   30 F.4th 874 (9th Cir. 2022) ..............................................................22

*Burrell v. Staff*,
   60 F.4th 25 (3d Cir. 2023) .................................................................40

*Bynoe v. Baca*,
   966 F.3d 972 (9th Cir. 2020) .......................................................*passim*

*Callejas v. McMahon*,
   750 F.2d 729 (9th Cir. 1984) ......................................................32, 34

*Conn. Nat'l Bank v. Germain*,
   503 U.S. 249 (1992).............................................................................28

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
   447 U.S. 102 (1980).............................................................................30

*Crow Tribal Housing Authority v. HUD*,
   781 F.3d 1095 (9th Cir. 2015) ....................................................24, 31, 34

*Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.*,
   99 F. Supp. 2d 1123 (E.D. Cal. 2000) .............................................31

*Dixon v. U.S.*,
   548 U.S. 1 (2006).........................................................................47, 55

*E.S. v. Best W. Int'l, Inc.*,
   510 F. Supp. 3d 420 (N.D. Tex. 2021) ............................................45

*Eid v. Alaska Airlines*,
   621 F.3d 858 (9th Cir. 2010) ......................................................57, 58

*Farmer v. Brennan*,
   511 U.S. 825 (1994).............................................................................47

*Friedman v. Live Nation Merch.*,
   833 F.3d 1180 (9th Cir. 2016) ....................................................47, 48

*Funk v. Tifft*,
515 F.2d 23 (9th Cir. 1975) .................................................................53

*G.G. v. Salesforce.com, Inc.*,
2023 WL 4944015 (7th Cir. Aug. 3, 2023) .................................................*passim*

*Gilbert v. U.S. Olympic Comm.*,
423 F. Supp. 3d 1112 (D. Colo. 2019).........................................................27, 45

*GO Comput. v. Microsoft Corp.*,
508 F.3d 170 (4th Cir. 2007) ...............................................................47

*Grynberg v. Total S.A.*,
538 F.3d 1336 (10th Cir. 2008) .........................................................56

*Hardeman v. Monsanto Co.*,
997 F.3d 941 (9th Cir. 2021) ..........................................................47, 49

*Hawkins v. U.S.*,
30 F.3d 1077 (9th Cir. 1994) .............................................................24

*Henson v. Fidelity National Financial, Inc*,
943 F.3d 434 (9th Cir. 2019) .......................................................*passim*

*Hunt v. Cromartie*,
526 U.S. 541 (1999)......................................................................48

*Int'l Shortstop v. Rally's*,
939 F.2d 1257 (5th Cir. 1991) ............................................................48

*Johnson v. HUD*,
911 F.2d 1302 (8th Cir. 1990) ...........................................................31

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994)...................................................................25, 33

*Liquilux Gas Corp., v. Martin Gas Sales*,
979 F.2d 887 (1st Cir. 1992)..........................................................23, 32

*Marmolejo-Campos v. Holder*,
558 F.3d 903 (9th Cir. 2009) ...........................................................46

*Maslic v. ISM Vuzem d.o.o.*,
  2021 WL 5415261 (N.D. Cal. Nov. 19, 2021) .................................................41

*McCoy v. Chase Manhattan Bank*,
  654 F.3d 971 (9th Cir. 2011) ...............................................24, 32, 34

*McKinney-Drobnis v. Oreshack*,
  16 F.4th 594 (9th Cir. 2021) ................................................................22

*Meyerhoff v. EPA*,
  958 F.2d 1498 (9th Cir. 1992) ...........................................................23

*Negusie v. Holder*,
  555 U.S. 511 (2009)...............................................................40, 44

*Nestle USA, Inc. v. Doe*,
  141 S. Ct. 1931 (2021)...............................................................39

*Norambuena v. W. Iowa Tech Cmty. Coll.*,
  2022 WL 987946 (N.D. Iowa Mar. 31, 2022)..................................................27

*O'Connor v. Boeing N. Am.*,
  311 F.3d 1139 (9th Cir. 2002) ....................................................47, 48

*Paguirigan v. Prompt Nursing Emp. Agency*,
  286 F. Supp. 3d 430 (E.D.N.Y. 2017)....................................................27

*Phelps v. Alameida*,
  569 F.3d 1120 (9th Cir. 2009) ....................................................*passim*

*Piamba Cortes v. Am. Airlines*,
  177 F.3d 1272 (11th Cir. 1999) ........................................................24, 25, 31

*Plaut v. Spendthrift Farm, Inc.*,
  514 U.S. 211 (1995).........................................................34, 35, 36, 37

*Ratha v. Phatthana Seafood*,
  35 F.4th 1159 (9th Cir. 2022) ....................................................*passim*

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993).........................................................44

vi

*Ricchio v. McLean,*
  853 F.3d 553 (1st Cir. 2017)...........................................................................*passim*

*Rodriguez v. Pan Am. Health Org.,*
  29 F.4th 706 (D.C. Cir. 2022)...............................................26, 41, 44

*Roe v. Howard,*
  917 F.3d 229 (4th Cir. 2019) ...............................................................38

*Rosenbloom v. Pyott,*
  765 F.3d 1137 (9th Cir. 2014) .............................................................46

*Ross v. Jenkins,*
  325 F. Supp. 3d 1141 (D. Kan. 2018).................................................27

*Russello v. U.S.,*
  464 U.S. 16 (1983).................................................................................40

*Saraswat v. Selva Jayaraman Business Integra,*
  2016 WL 5408115 (E.D.N.Y. Sept. 28, 2016) .................................27

*SEC v. Seaboard Corp.,*
  677 F.2d 1297 (9th Cir. 1982) .............................................................48

*Sherman v. Trinity Teen Sols.,*
  2021 WL 7286424 (D. Wyo. Nov. 30, 2021).....................................27

*Snapp v. United Transp. Union,*
  889 F.3d 1088 (9th Cir. 2018) .............................................................37

*Swinton v. Potomac Corp.,*
  270 F.3d 794 (9th Cir. 2001) ...............................................................46

*Taylor v. U.S.,*
  181 F.3d 1017 (9th Cir. 1999) (en banc) ......................................36, 37

*B.K. ex rel. Tinsley v. Snyder,*
  922 F.3d 957 (9th Cir. 2019) ...............................................................22

*U.S. v. Afyare,*
  632 Fed. App'x 272 (6th Cir. 2016) ...................................................45

*U.S. v. Contreras,*
    895 F.2d 1241 (9th Cir. 1990) ............................................................31

*U.S. v. Dann,*
    652 F.3d 1160 (9th Cir. 2011) ..............................................................7

*U.S. v. Donaghe,*
    50 F.3d 608 (9th Cir.1994) ..................................................................24

*U.S. v. Montgomery Cnty.,*
    761 F.2d 998 (4th Cir. 1985) .........................................................24, 32

*U.S. v. Ne. Pharm. & Chem. Co.,*
    810 F.2d 726 (8th Cir. 1986) ...............................................................31

*U.S. v. Nelson,*
    61 F.3d 914 (9th Cir. 1995) .................................................................24

*U.S. v. Oswald,*
    441 F.2d 44 (9th Cir. 1971) .................................................................48

*U.S. v. Wyle (In re. Pac. Far E. Lines, Inc.),*
    889 F.2d 242 (9th Cir. 1989) .........................................................37, 59

*United Klans of Am. v. McGovern,*
    621 F.2d 152 (5th Cir. 1980) ...............................................................47

*Venoco, LLC v. Plains Pipeline, L.P.,*
    2022 WL 1090947 (9th Cir. Apr. 12, 2022).........................................20, 23, 60

*Voisine v. U.S.,*
    579 U.S. 686 (2016)............................................................................47

*Wang v. Gold Mantis Constr. Decoration,*
    2021 WL 2065398 (D.N. Mar. I. May 24, 2021) ..................................45

*Wesson v. U.S.,*
    48 F.3d 894 (5th Cir. 1995) ...........................................................24, 32

*Yniques v. Cabral,*
    985 F.2d 1031 (9th Cir. 1993) .............................................................38

viii

**Statutes**

18 U.S.C. § 1589 ............................................................................*passim*

18 U.S.C. § 1590 ......................................................................................26

18 U.S.C. § 1591 ......................................................................................26

18 U.S.C. § 1594 ..........................................................................26, 27, 29

18 U.S.C. § 1595 ............................................................................5, 26, 29

18 U.S.C. § 1962 ................................................................................21, 44

22 U.S.C. § 7101 ......................................................................................56

28 U.S.C. § 1291 ........................................................................................3

28 U.S.C. § 1331 ........................................................................................3

28 U.S.C. § 2254 ......................................................................................20

Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117-
347, 136 Stat., 6199 (2023)..........................................................*passim*

**Legislative Authorities**

154 Cong. Rec. S4799 (daily ed. May 22, 2008)....................................40

*The Global Fight to End Modern Slavery: Hearing Before the S.
Comm. on Foreign Rel.,* 115th Cong. (2018) ....................................39

*International Trafficking in Women and Children: Hearing Before the
Subcomm. On Near E. & S. Asian Aff. of the S. Comm. on Foreign
Rel.*, 106th Cong. (2000) ..................................................................39

**Other Authorities**

10A Charles A. Wright, Arthur R. Miller & Mary Kane, *Federal
Practice and Procedure* §§ 2729, 2730 (4th ed. 2023 update) .........48

Fed. R. App. P. 4........................................................................................3

Fed. R. Civ. P. 60 ..............................................................................*passim*

Pat McDonnell, *The Doctrine of Clarifications*, 119 Mich. L. Rev. 797, 807 (2021)...................................................................................................25

Norman & Shambie Singer, *1A Sutherland Statutes and Statutory Construction* § 22:31 (7th ed. 2022 update).......................................................32

Martina E. Vandenberg & Maggie Lee, *Congress Amends the TVPRA to Correct Ninth Circuit's Erroneous Ruling in Ratha,* Transnational Litigation Blog, (Aug. 1, 2023) .......................................30, 32, 33

# I. __INTRODUCTION__

Plaintiffs file this appeal against one Defendant – Rubicon Resources, a U.S. company that imported goods (in this case, packaged shrimp) made with forced labor. A prior panel of this Court held that Rubicon could not be held liable under the Trafficking Victims Protection Reauthorization Act's civil remedy on the sole ground that, under its interpretation, the statute did not reach a defendant who unsuccessfully attempted to benefit from forced labor. *Ratha v. Phatthana Seafood*, 35 F.4th 1159, 1176 (9th Cir. 2022). Here, Plaintiffs suffered harm, but Rubicon did not profit only because Walmart, the intended customer, refused to accept the shrimp after it arrived in the United States. Walmart did not want to accept shrimp tainted by allegations of forced labor.

Shortly after this Court ruled, President Biden signed into law a "technical and clarifying" amendment reaffirming that the TVPRA civil remedy is actionable against defendants who attempt to benefit from participation in a venture that engages in forced labor. The United States Congress passed the amendment as part of the Abolish Trafficking Reauthorization Act of 2022 – without a single vote in opposition – to correct this Court's decision in *Ratha*.

The United States has been a leader in the global fight against human trafficking and forced labor. As part of that effort, Congress enacted and repeatedly reauthorized the TVPRA, a comprehensive statutory scheme of interlocking and

1

mutually reinforcing provisions that provides both criminal penalties and civil remedies coextensive with its criminal prohibitions. Congress intentionally targeted the economic beneficiaries of these crimes, including those who attempt or conspire to benefit, because Congress understood that trafficking and forced labor are highly lucrative crimes that put ethical businesses and American workers at a disadvantage. Congress intended victims of these crimes to have a remedy, even if the defendant did not succeed in profiting from their abuse – whether that failure was due to an arrest or, as here, a customer who objected.

After President Biden signed the ATRA into law, Plaintiffs moved to reopen judgment as to just one of the defendants below, Rubicon Resources. Defendants conceded below that four Plaintiffs presented sufficient evidence of their abuse and never moved for summary judgment on their claims that they were subjected to peonage, forced labor, and human trafficking. Defendant Rubicon also conceded that it had attempted to sell the shrimp produced by the Plaintiffs.

This Court has repeatedly held that extraordinary circumstances such as these warrant relief under Federal Rule of Civil Procedure 60(b)(6). But instead the lower court concluded the ATRA did not apply to this case and doubled down on its prior ruling – not addressed by this Court in the prior appeal – that (a) applied the wrong test, a test discarded by every other circuit to consider it, for "participation" in a venture and (b) misapplied the summary-judgment standard

and the governing law to conclude that Rubicon could not know the laborers were subject to forced labor, even after, *inter alia*, Plaintiff Keo Ratha's complaints were widely reported by the media and circulated by Rubicon management, the United Nations held a meeting on the allegations that was attended by a Rubicon manager, and Walmart refused to accept the shrimp, citing its concerns about forced labor. Because the lower court's decision rests on legal errors, the decision should be overturned and the judgment vacated, permitting Plaintiffs to try their case against Rubicon to a jury.

## II. <u>STATEMENT OF JURISDICTION</u>

The district court had jurisdiction over this matter under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291, as Plaintiffs appeal a final order denying Plaintiffs' motion for relief from judgment entered on March 3, 2023. 1-ER-2. A notice of appeal was timely filed on March 31, 2023. *See* Fed. R. App. P. 4; 10-ER-2195.

## III. <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

1. Did the district court err by holding that ATRA Section 102 was not a clarifying amendment despite Congress' express text describing the amendment as "technical and clarifying"?

2.      Did the district court err as a matter of law by incorporating into its analysis on Plaintiffs' FRCP 60(b) motion legal errors previously made in its summary judgment order?

3.      Should the judgment in favor of Defendant Rubicon be vacated pursuant to Rule 60(b)(6)?

A statutory addendum containing the pertinent statutes is attached.

## IV.  **STATEMENT OF THE CASE**

### A.    **Procedural History**

Seven plaintiffs filed this lawsuit in 2016 against four defendants: the U.S. importer (Rubicon), and three defendants who are not part of this appeal (a quality control company and the factory defendants). 10-ER-2154.

In 2017, all four defendants moved for summary judgment, albeit on different grounds. The district court granted all four motions.  1-ER-11.

Relevant here, the district court ruled that Rubicon could not be held liable because it concluded that: (1) Rubicon did not "participate" in a venture with the factory defendants; (2) Rubicon could not have known of the factory defendants' alleged human trafficking or forced labor; and (3) attempt to benefit was not cognizable. 1-ER-15-17.

4

Plaintiffs appealed. On February 25, 2022, this Court affirmed. With regard to Rubicon, this Court held only that "§ 1595(a) does not encompass attempts to benefit." *Ratha*, 35 F.4th at 1176. The Court did not reach the district court's two alternative bases for dismissal. *See id.* at 1175-76. The plaintiffs petitioned for en banc rehearing. This Court amended its opinion on May 31, 2022, denied the petition, and then issued its mandate on June 8, 2022.

Less than seven months later, on January 5, 2023, President Biden signed the ATRA, which amended and reauthorized the TVPRA. Pub. L. No. 117-347, 136 Stat., 6199 (2023). ATRA Section 102 states:

> **TECHNICAL AND CLARIFYING UPDATE TO CIVIL REMEDY.**
> Section 1595(a) of title 18, United States Code, is amended by inserting "or attempts or conspires to benefit," after "whoever knowingly benefits,".

Eleven days after the ATRA was signed into law, Plaintiffs moved for relief from judgment pursuant to Rule 60(b)(6) as to Defendant Rubicon. Plaintiffs argued that the ATRA, as a clarifying amendment, applied to Rubicon's conduct in this case and constituted an extraordinary circumstance that warranted relief from judgment under the factors this Court announced in *Phelps v. Alameida*, 569 F.3d 1120, 1135-39 (9th Cir. 2009). The district court disagreed and denied relief. 1-ER-2. Of the five relevant *Phelps* factors, the district court agreed that two favored the Plaintiffs (the Plaintiffs' diligence and the lack of delay between the judgment

5

and the motion) and that one was neutral (reliance on the final judgment). 1-ER-5-8. Nevertheless, the district court concluded that two of the other *Phelps* factors weighed against Plaintiffs (the nature of the change in law and the relation between the change in law and the challenged judgment). *Id*. The district court concluded that both these factors weighed against relief because it erroneously concluded that (1) the ATRA did not apply, and (2) its alternative rulings on summary judgment, though not addressed on appeal, independently supported the judgment. 1-ER-6-7. Based on these errors, the district court concluded the *Phelps* analysis weighed against relief and thus denied Plaintiffs' motion.

**B.     Facts**

1.     **Rubicon did not contest four Plaintiffs' forced labor claims**

Defendants below did not dispute that sufficient evidence supported the claims of at least four Plaintiffs that they were subjected to forced labor, peonage, involuntary servitude, and human trafficking in order to produce seafood for the U.S. market. Dkt. 147 at 2, n.4; Dkt. 145 at 1-2.

Plaintiffs Sem Kosal and his wife Sophea Bun, for example, were recruited to work at the Phatthana seafood factory, which was facing a labor shortage. 10-ER-2159; 2-ER-27-28; 2-ER-54; 3-ER-436-437.[1]  They used their home and their

---

[1] Plaintiffs cite largely to the Complaint because the facts related to the four Plaintiffs were not contested at summary judgment. Defendants contested only the claims of three other Plaintiffs who were undocumented (a category that Congress

parents' land as collateral to pay the required recruitment fees. 10-ER-2159. They alleged that they were promised free accommodation and good wages, but when they arrived at the factory, they were paid much less than promised, were charged for crowded and filthy accommodation, and faced other unexpected salary deductions, leaving them without enough money to send home to support their children or even to buy sufficient food for themselves. 10-ER-2156; 10-ER-2158-2162; 2-ER-180 (housing infested with bugs, no water for bathing); 2-ER-190-191.

Plaintiffs' passports were confiscated, and despite the workers' pleas, Phatthana refused to return them. 10-ER-2178. Phatthana staff told Plaintiffs they could not get their passports back until their recruitment fee was paid off. 10-ER-2181. Workers who complained were threatened. *Id.*

Defendants' own staff, third party witnesses, and Plaintiffs testified that the workers were told that they would be arrested if they left the factory without their passports or if they tried to escape. 9-ER-2114; 2-ER-98; 2-ER-115; 2-ER-142-145; 2-ER-181; 3-ER-537; 3-ER-570-571 (defendants' witness: it is "obvious" workers without proper papers "would be arrested"). Police came to the factory every three to four days. 9-ER-2111 ("workers themselves saw the police, too. Sometime in the morning, sometime in the afternoon."). Arrest was not an idle

---

and the courts have recognized is particularly vulnerable to human trafficking. *E.g., U.S. v. Dann*, 652 F.3d 1160, 1172 (9th Cir. 2011)).

threat: worker and manager testimony confirmed workers were, in fact, arrested. 2-ER-80-81; 3-ER-571.

In the meantime, the conditions in which the Plaintiffs worked were harrowing. Supervisors yelled at the workers, they could be penalized for taking bathroom breaks, and Plaintiffs witnessed other workers being beaten, including into unconsciousness. 2-ER-78; 2-ER-98-99; 4-ER-696; 4-ER-790. The workers were not provided adequate protective gear and suffered from chemical exposure, two developing severe respiratory conditions as a result. 10-ER-2180-2181; 2-ER-41; 2-ER-180; 3-ER-537.

Unfortunately, Plaintiffs' experiences are not aberrational. The Department of Labor maintains a list of goods produced by forced labor. Thai shrimp has been a mainstay on the list since it was first published in 2009. 8-ER-1633; 8-ER-1796 (discussing "Dirty Goods List"). Since 2008, the Department of State Trafficking in Persons Report ("TIP report") – which receives widespread global attention – has highlighted trafficking and forced labor as pervasive within the Thai seafood and shrimp processing industry. 4-ER-712-715; 4-ER-726-748; 7-ER-1594-1596. For example, the 2011 TIP report highlighted that trafficking in Thai fishing-related industries was a significant problem; Cambodia was a source country for migrants found in forced labor in the seafood processing industry; workers were recruited through fraud and subjected to debt bondage; and migrants were

8

subjected to "withholding of travel documents, migrant registration cards, and work permits by employers." 4-ER-739-742; 4-ER-785-786.

The 2011 TIP Report on Thailand also highlighted that "direct involvement in and facilitation of human trafficking by law enforcement officials reportedly remained a significant problem." 4-ER-739; *see also id.* (noting local police corruption, biases against migrant laborers, lack of understanding about trafficking, lack of training, and systematic disincentives against identifying victims). Corruption was a widely recognized problem among both Thai and Cambodian law enforcement, particularly with respect to identifying and prosecuting trafficking in the seafood industry. 4-ER-703-706; 3-ER-439-441. The State Department consistently criticized Thailand, eventually giving it the equivalent of a failing grade, in the TIP report because the government did not meet minimum standards for combatting trafficking in persons. 2-ER-53; 4-ER-713-714; 4-ER-753-748.

## 2. Rubicon participated in a venture to sell shrimp in the United States that was produced with forced labor

Rubicon was founded by the majority owner of the Phatthana factory, in partnership with other Thai seafood producers, to expand their sales into the United States. 5-ER-936; 5-ER-1048; 5-ER-856. Rubicon's participation was crucial to the success of the venture: (1) Phatthana could not attract its target customers – large retailers such as Walmart – without Rubicon (5-ER-936-937; 5-ER-957-958; 5-ER-998); (2) Rubicon obtained and retained these large customers by marketing

the combined volume and steady supply of its venture partners, including

Phatthana (3-ER-406-413; 5-ER-1021-1042; 5-ER-1048) and (3) the venture only

made money when Rubicon sold to U.S. customers (3-ER-409).

Rubicon played a key role in the venture. 3-ER-399; 3-ER-407-408; 3-ER-411; 5-ER-1000; 5-ER-1048; 5-ER-1061-1062; 6-ER-1228; 6-ER-1230 ("Thai

packers have no need to perform activities such as sales forecasting, market

research, and the development of new packaging for their U.S. affiliate, because

Rubicon Resources performs these services itself, using its sales and marketing

staff based in the United States"). Rubicon marketed to and obtained contracts with

large supermarket chains, primarily for their private-label shrimp. 6-ER-1137; 6-ER-1254-1255; 6-ER-1258-1259. Rubicon ensured that the product, including the

shrimp and packaging, was identical regardless of which venture member supplied

it. 5-ER-1000; 6-ER-1137-1138; 6-ER-1258-1259.

Rubicon even invested in 150 shrimp farms to help ensure that the Thai

factories had access to an acceptable supply of raw shrimp. 3-ER-409.

For years, Rubicon worked closely with Phatthana, including on-site visits to

its factories, to obtain needed certifications, help its factories navigate U.S.

customer audit requirements (including by cherry-picking the auditor), supervise

quality control, and manage all aspects of marketing, sale, and import into the

United States. 3-ER-370-371; 4-ER-796; 5-ER-974; 6-ER-1137-1138; 6-ER-1248-

1249; 6-ER-1253-1255; 6-ER-1260; 6-ER-1276; 6-ER-1295. For example,

Rubicon conducted on-site pre-audits of Phatthana's factories. 6-ER-1235-1236; 6-

ER-1275. Rubicon arranged for and was listed as the "supplier" on Walmart's

audit. 3-ER-541. And Rubicon arranged for trainings of Phatthana staff by

Walmart after poor audit scores were received. 6-ER-1286-1290; 6-ER-1291-1293.

Rubicon arranged for import and shipping, including serving as Phatthana's

registered FDA agent. 5-ER-1065-1066; 5-ER-1081-1083; 9-ER-2103-2104.

Rubicon forecasted demand, managed inventory, warehoused the shrimp, and

filled orders from stored inventory. 3-ER-421-422; 5-ER-1071-1072; 5-ER-1076;

5-ER-1080; 5-ER-1083; 6-ER-1230-1231. Rubicon also negotiated the price,

handled the customer-facing interactions, including visits and calls to customers,

and provided after-sales service. 5-ER-1060; 6-ER-1137; 6-ER-1294.

Correspondence between Rubicon and Phatthana managers demonstrated a

high level of involvement in Phatthana operations, including in labor issues. 3-ER-

451-454; 6-ER-1276-1280; 6-ER-1295 (inquiry regarding strike); 6-ER-1297

(inquiry regarding worker hiring documents); 6-ER-1332 (directions regarding

language of pay stubs). Rubicon staff conducted multiple visits to Phatthana's

factories and communicated frequently via email and phone. 3-ER-412; 3-ER-451;

6-ER-1147 (Rubicon "went on a regular basis" and "several times" specifically to

11

Songhkla factory); 6-ER-1276-1277; 6-ER-1291; 6-ER-1380-1381 (Rubicon CEO Wynn had opportunities to observe workers).

Rubicon also handled press and public relations, including coordinating Phatthana's response to the forced labor allegations to protect the venture. 3-ER-564 (Rubicon CEO to decide how to respond); 6-ER-1303 (Rubicon CEO "we have been working for several days to defuse the story"); 6-ER-1310-1313 (need to "come up with a position" on "passport withholding"). Rubicon conducted a coordinated campaign to manage the bad publicity, including preparing talking points and managing relationships with customers, industry groups, and the United Nations. 6-ER-1305; 6-ER-1307; 6-ER-1312-1313; 6-ER-1384 (undisputed that Rubicon worked to defuse story); 9-ER-2116.

Rubicon's own marketing materials touted its integral role in the venture, including as "supply chain management experts." 5-ER-1021; 5-ER-1025; 5-ER-1032; 5-ER-1040; 5-ER-1314-1317 ("our program includes traveling overseas to visit our partners"); 6-ER-1319 (touting "ability to dictate the means and methods in which seafood is produced"); 6-ER-1322 ("control every aspect of production"). Rubicon's customers relied on these representations of control from "pond to the plate." 6-ER-1326; *see also* 3-ER-408.

### 3.     It is undisputed that Rubicon attempted to sell shrimp to Walmart and that Walmart refused the shrimp

It is undisputed that Rubicon attempted to sell 14 shipments of shrimp –

over 200 tons produced by the Songkhla factory while Plaintiffs were subjected to

forced labor there – to Walmart. 6-ER-1360.

Walmart rejected that shrimp due to Walmart's concerns about the forced-

labor allegations at the heart of this case. 5-ER-966 ("Q: But the reason Sam Club

did not want your product was because of the allegations of forced labor, correct?

A: Yes."); 7-ER-1558-1560 ("Sam's is refusing to accept any inventory produced

in Songkhla"). Rubicon repeatedly continued its attempts *after* Rubicon knew of

the allegations and *after* Walmart refused to accept the shrimp due to concerns

about forced labor. 6-ER-1294 (Rubicon CEO: "I have been working my best to

convince WM to allow us to deliver this product into their system.").

### 4.     By the time it attempted to sell the shrimp to Walmart, Rubicon knew, recklessly disregarded, and/or should have known of the forced labor and other abuses

Rubicon attempted to sell the shrimp produced by forced labor at Phatthana

to Walmart from at least July 26, 2012 (7-ER-1558) to September 13, 2012 (6-ER-

1294).

Long before this time, ample evidence demonstrates that Rubicon knew,

recklessly disregarded, and/or should have known of the forced labor and other

abuses.

13

In January 2012, Plaintiff Keo Ratha became a whistleblower and told the Phnom Penh Post that he was subject to forced labor: that he and "hundreds of Cambodians at Phatthana Frozen Food Factory **wanted to leave but were unable to get their passports back**." Meas Sokchea, *Workers 'threatened' for speaking to press*, Phnom Penh Post, Jan. 26, 2012 (emphasis added); Meas Sokchea, *Migrant workers seek way out of Thailand*, Phnom Penh Post, Feb. 22, 2012. Such articles were circulated among top Rubicon managers. 6-ER-1300 ("now national news in the USA"); 6-ER-1310; 7-ER-1564 ("Not positive PR!" comment on article reporting "most of the 1,000 workers want to leave but are waiting for the company to answer their requests for their passports back."); 7-ER-1565-1566 ("OUCH…" comment on editorial entitled "End this abuse by companies" and reporting Phatthana "seized workers' documents to keep them from quitting"). Rubicon did not dispute that it was "alerted to" these allegations by February 2012. 6-ER-1374.

Rubicon began a coordinated campaign in the spring of 2012 to manage the bad publicity, lining up support letters from trade groups and other allies. 6-ER-1303; 6-ER-1310; 6-ER-1384 (undisputed: "Rubicon worked to defuse the story.").

Later that spring, non-governmental organizations and a local University investigated and corroborated Ratha's report, leading human-rights groups to call for corrective measures. 4-ER-790–794 (Human Rights Watch); 7-ER-1568; 7-ER-

1578 (confirming passport confiscation and debt bondage at Phatthana). In April 2012, an industry consultant reported to Rubicon that debt bondage was "probably the most significant issue" and "warrants serious investigation." 3-ER-565. But Rubicon's CEO could not recall conducting any investigation in response to that recommendation. 6-ER-1159; 6-ER-1165-1166; 6-ER-1178-1179.

In June 2012, a meeting was held on human trafficking in the Thai seafood industry under the auspices of the United Nations that focused on the allegations in this case and was attended by a Rubicon manager, as well as by representatives of Human Rights Watch, the International Labor Office ("ILO"), Thai Union, and government representatives. 6-ER-1307-1308; 6-ER-1312-1313. The Rubicon manager reported to Rubicon's CEO that "it was Rubicon and PTN as the target" and that Phatthana was brought up as "an example of all thing[s] wrong," including document withholding. 6-ER-1312. His internal memo explains that the United Nations moderator "beat the trafficking drum and document seizure over and over" and concluded that Phatthana's CEO "needs help understanding the national and international impact of his problems." 6-ER-1312-1313.

Internally, a Rubicon executive confirmed that "[s]omething is wrong with the Human Resources system with the PTN group" and recommended against scheduling a Walmart audit at the factory because it would get a "negative report." 7-ER-1561.

In addition, the prevalence of debt bondage, forced labor, and human trafficking in the Thai seafood-processing industry generally and at Phatthana specifically was well documented and well known long before Keo Ratha's 2012 whistleblower report and the United Nations meeting. Plaintiffs submitted reports from Luis C. deBaca, U.S. Ambassador for the Office to Monitor and Combat Trafficking in Persons from 2009 to 2014, and Roger Plant, the former director of the ILO Program to Combat Forced Labor and an expert on labor exploitation in the seafood industry, that detailed the intense attention that governments (including the United States), NGOs, consumer organizations, and responsible businesses have paid to the problem of human trafficking and forced labor in the Thai seafood sector over the years prior to Plaintiffs' trafficking. The deBaca and Plant reports list the studies, reports, and news articles that illustrated the state of knowledge on these issues beginning in 2008. 2-ER-32-38; 4-ER-703; 4-ER-709-711; *see also* 4-ER-629-635; 5-ER-1011; 8-ER-1795-1796; 8-ER-1857. Ambassador deBaca and Mr. Plant also detailed specific investigations, prosecutions, actions, and meetings by the United States and other governments that put entities doing business with the seafood industry on notice of the abuses at Thai shrimp processing factories, including Phatthana. 2-ER-29-30; 4-ER-708-715; *see also* 3-ER-425; 3-ER-445-446.

Rubicon CEO Brian Wynn testified that he was aware of this reporting. 3-ER-449; 5-ER-1087-1088; 5-ER-1115-1116; 6-ER-1150; 6-ER-1153; 6-ER-1155; 6-ER-1371 (Undisputed that Defendants were aware of these reports); *see also* 2-ER-37-38; 3-ER-395; 3-ER-448-461.

Previously, Rubicon argued that it relied on an audit and Thai government investigations when doing business with Phatthana. But the only audit conducted after Ratha's whistleblower report was a routine audit that did not include any evaluations of debt bondage, human trafficking, or forced labor of adults. 3-ER-327-328. This audit did not meet industry standards, and its deficiencies were well known. 2-ER-53 (U.S. Embassy: "audits cannot guarantee no problems exist in a supply chain"); 3-ER-454-460 (Rubicon relied upon audits that did not comply with basic standards); 4-ER-718-724; 8-ER-1797-1798; 8-ER-1859 (2008 *Seafood News*: certifications focus on food safety, not labor problems); *see also* 6-ER-1239 (Phatthana was provided audit "guidelines" in advance).

Moreover, Rubicon was well aware that the Thai investigations were at best inadequate and at worst a sham. Indeed, a Rubicon executive explained "PTN came out well because the Thai law is very weak or nonexistent." 6-ER-1312; *see also* 2-ER-53 ("Embassy appears to be growing frustrated by lack of Thai government action" and gave example of Phatthana Seafood). The U.S. State Department has documented that Thai law enforcement was not adequately trained

17

to identify indicators of trafficking: "Law enforcement officers often believed that physical detention or confinement was the essential element to confirm trafficking and failed to recognize exploitive debt or manipulation of undocumented migrants' fear of deportation as non-physical forms of coercion used in human trafficking." 4-ER-751; 4-ER-720. Corruption was a widely recognized problem among both Thai and Cambodian law enforcement, particularly with respect to trafficking in the seafood industry. *E.g.*, 3-ER-439-441; 4-ER-636; 4-ER-661; 4-ER-703-706; 4-ER-737 (U.S.: "Corruption remained widespread among Thai law enforcement personnel" and citing reports that police protected seafood facilities from inspections); 7-ER-1566. As a result, it was widely recognized that the investigations failed to comply with basic standards. 2-ER-67; 3-ER-440-441; 4-ER-705; 4-ER-718-719; 8-ER-1797-1799. For example, one investigator testified that he did not see the Plaintiffs' housing, but if he had, "the report could have been different." 9-ER-2060. The United States downgraded Thailand to the lowest level in the TIP report rankings due to this well-known history of corruption and law-enforcement failures. 4-ER-714.

Even so, the Thais did not clear Phatthana but instead found multiple labor-law violations. In July 2012, the Thai Government, while it reported no specific Thai trafficking law crimes, found that Phatthana had withheld worker passports with "wrongfulness"; illegally deducted workers' wages; violated the 1975 Labour

Relations Act; been ordered to comply by the Songkhla Provincial Labour
Protection Office; and was under investigation by the Ministry of Labour. 9-ER-
2064-2065. Indeed, it is undisputed that Rubicon learned after April 2012 that the
salary deductions at Phatthana were not in accordance with Thai law. 6-ER-1369.

## V. <u>SUMMARY OF ARGUMENT</u>

This Court ruled that the TVPRA civil remedy does not extend to a
defendant who attempts to benefit from participation in a venture engaged in
forced labor but does not succeed in doing so, although the predicate criminal
provision provided for attempt liability. This Court based its analysis on the text of
the statute, text that Rubicon conceded was "not be a model of clarity." Defs.-
Appellees' Response to Petition for Rehearing en Banc at 9, *Ratha v. Phatthana
Seafood Co.*, 35 F.4th 1159, (9th Cir. 2022) (Dkt. 103).

Shortly after this Court ruled, the United States Congress reauthorized the
TVPRA and included a "clarifying and technical" amendment reaffirming that
Congress had intended that the civil remedy be available for victims of those who
attempt, but fail, to profit.

Because clarifying amendments are not subject to the presumption against
retroactivity, Plaintiffs moved to reopen judgment pursuant to Rule 60(b)(6),
seeking to apply the ATRA to this case.

This Court has held on multiple occasions that a post-judgment change in controlling law can constitute extraordinary circumstances warranting Rule 60(b)(6) relief. *See Bynoe v. Baca*, 966 F.3d 972, 983 (9th Cir. 2020); *Henson v. Fidelity National Financial, Inc*, 943 F.3d 434, 444 (9th Cir. 2019); *Phelps*, 569 F.3d at 1134-35; *see also Venoco, LLC v. Plains Pipeline, L.P.*, 2022 WL 1090947, at *2 (9th Cir. Apr. 12, 2022).

In *Phelps*, the Court promulgated a five-part test for determining whether a change in law constitutes extraordinary circumstances sufficient for 60(b) relief:

> (1) the nature of the legal change, including whether the change in law resolved an unsettled legal question; (2) whether the movant exercised diligence in pursuing reconsideration of his or her claim; (3) the parties' reliance interests in the finality of the judgment; (4) the delay between the finality of the judgment and the Rule 60(b)(6) motion; (5) [and] the relationship between the change in law and the challenged judgment.

*Bynoe*, 966 F.3d at 983 (citing *Phelps*, 569 F.3d at 1134-40); *see also Henson*, 943 F.3d at 446 (extending application of *Phelps* to civil damages actions).[2]

The district court made multiple errors of law – and thus abused its discretion – in denying Plaintiffs' Rule 60(b)(6) motion. The district court concluded that the second and fourth *Phelps* factor favored relief and that the third factor was neutral. It nevertheless denied relief because it made errors of law in its

---

[2] A sixth factor (comity) applies only in the context of 28 U.S.C. § 2254 habeas petitions. *See Henson*, 943 F.3d at 453.

evaluation of the first and fifth *Phelps* factors, leading it to conclude that ATRA would not result in a different outcome.

First, the district court concluded that the ATRA is a substantive amendment that did not apply. This is error, as Congress explicitly stated the ATRA is a clarifying amendment, and, as the district court itself recognized, clarifying amendments, because they overrule wrongly decided cases and make clear what was what intended all along, are not subject to the presumption against retroactivity.

Second, the district court erred by ruling the judgment was independently supported by its holding on summary judgment that (1) Rubicon did not "participate" in a venture and (2) Rubicon could not have known about the forced labor. As the Plaintiffs demonstrated in their prior appeal (in an argument this court did not reach), both rulings are based on legal errors. The district court improperly grafted an inapplicable RICO standard onto the TVPRA's participation element – an approach rejected by every other court to consider it. And on mens rea, the district court erred by drawing inferences against the Plaintiffs or otherwise improperly discounting Plaintiffs' evidence of Rubicon's state of mind, which is a textbook jury issue.

## VI.  <u>STANDARD OF REVIEW</u>

The denial of a Rule 60(b) motion is reviewed for abuse of discretion. *See, e.g.*, *Henson*, 943 F.3d at 443. "'[T]he district court necessarily abused its discretion if its denial "rested upon an erroneous view of the law"' or on a 'clearly erroneous finding of material fact.'" *Id.* (citations omitted) (alteration in original); *see also, e.g.*, *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 965 (9th Cir. 2019) ("An error of law is a per se abuse of discretion.").

Questions of statutory interpretation, including whether a statutory amendment is a clarification, are questions of the law that the Court reviews de novo. *See, e.g.*, *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 603 (9th Cir. 2021); *see also Beverly Cmty. Hosp. Ass'n v. Belshe*, 132 F.3d 1259, 1264-65 (9th Cir. 1997).

Finally, whether summary judgment was properly granted is also a question of law that this Court reviews de novo. *E.g.*, *Buchanan v. Watkins & Letofsky, LLP*, 30 F.4th 874, 877 (9th Cir. 2022). In doing so, the Court must "[v]iew[] the evidence in the light most favorable to the non-moving party" and "determine whether any genuine issues of material fact exist and whether the district court correctly applied the substantive law." *Id.*

# VII.  ARGUMENT

Rule of Civil Procedure 60(b)(6) "gives the district court power to vacate judgments 'whenever such action is appropriate to accomplish justice'" and "should be liberally applied." *Henson*, 943 F.3d at 443 (internal citations omitted). Here, Congress and the Executive Branch repudiated this Court's interpretation of the TVPRA soon after this case's journey through the federal court system came to an end. *Phelps* and its progeny demonstrate that in such circumstances, relief under Rule 60(b)(6) is warranted. *See* 569 F.3d at 1135-39; *see also Venoco*, 2022 WL 1090947, at *2; *Bynoe*, 966 F.3d at 983-86; *Henson*, 943 F.3d at 446-55. Because the district court rested its denial of 60(b) relief on legal errors, which led it to weigh the first and fifth *Phelps* factors against Plaintiffs, the decision should be overturned and the judgment vacated.

## A.   The lower court's decision to deny 60(b) relief rests on legal errors

### 1.   ATRA applies to this case

#### a.   Clarification is a well-established doctrine and is not subject to retroactivity analysis

"Clarification, effective *ab initio*, is a well-recognized principle." *Liquilux Gas Corp., v. Martin Gas Sales*, 979 F.2d 887, 890 (1st Cir. 1992); *see also Meyerhoff v. EPA*, 958 F.2d 1498, 1502 (9th Cir. 1992) (clarification is "a common and customary legislative procedure"). "[W]hen an amendment alters, even 'significantly alters,' the original statutory language, this does 'not necessarily'

indicate that the amendment institutes a change in the law." *Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004). It is beyond dispute that "Congress may amend a statute simply to clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases." *Hawkins v. U.S.*, 30 F.3d 1077, 1082 (9th Cir. 1994); *see also, e.g., Piamba Cortes v. Am. Airlines,* 177 F.3d 1272, 1283 (11th Cir. 1999); *U.S. v. Nelson*, 61 F.3d 914, 1 (9th Cir. 1995); *Wesson v. U.S.*, 48 F.3d 894 (5th Cir. 1995) ("more plausible interpretation of the amendment is that the *Miller* case was wrongly decided and Congress acted to correct it"); *U.S. v. Montgomery Cnty.*, 761 F.2d 998, 1003 (4th Cir. 1985) ("Statutes may be passed purely to make what was intended all along even more unmistakably clear.").

It is similarly well-settled that such "clarifying" legislation is not subject to any presumption against retroactivity. *E.g.*, *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1186 (9th Cir. 2016) (no retroactivity analysis required); *Crow Tribal Housing Authority v. HUD,* 781 F.3d 1095, 1101 (9th Cir. 2015); *McCoy v. Chase Manhattan Bank*, 654 F.3d 971, 974 (9th Cir. 2011); *Brown*, 374 F.3d at 259; *ABKCO Music, Inc. v. Lavere*, 217 F.3d 684, 691 (9th Cir. 2000) ("no retroactivity problem is presented" by amendment overturning court decision); *Piamba Cortes,* 177 F.3d at 1283; *U.S. v. Donaghe*, 50 F.3d 608, 612 (9th Cir.1994) ("Normally, when an amendment is deemed clarifying rather than substantive, it is applied

retroactively."); *see also* Pat McDonnell, *The Doctrine of Clarifications*, 119 Mich. L. Rev. 797, 807 (2021).[3]

The district court agreed with both these well-established principles. The district court erred, however, when it concluded the ATRA was not a clarifying amendment.

### b.    ATRA is a clarifying amendment

To determine whether an amendment is "clarifying," courts look to Congress' intent as expressed in the text, the timing, and other indicators. *E.g.*, *Brown*, 374 F.3d at 259; *ABKCO Music*, 217 F.3d at 691; *Piamba Cortes,* 177 F.3d at 1283-84; *Beverly Cmty. Hosp. Ass'n*, 132 F.3d at 1265.

### i.    Statutory background and the Court's holding

Plaintiffs had argued that they stated a claim under 18 U.S.C. § 1589(b), which provides:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means …

18 U.S.C. § 1589(b).

---

[3] As a result, the traditional *Landgraf v. USI Film Prods.*, 511 U.S. 244, 267 (1994) analysis is not implicated, but even if it did apply, it would be satisfied at the first step.

It is undisputed that "attempt" liability attaches to § 1589. *See Ratha*, 35 F.4th at 1176 (citing 18 U.S.C. § 1594). That is, it is undisputed that a person who attempts to violate § 1589(a) or (b) is "punishable in the same manner as a completed violation." 18 U.S.C. § 1594(a). A person who violates § 1589(b) "shall be punished" in the same manner as a person who violates § 1589(a): by a term of imprisonment. 18 U.S.C. § 1589(d).

A person who violates § 1589(a) or (b) is also subject to civil liability under the TVPRA. 18 U.S.C. § 1595(a). Indeed, the D.C. Circuit specifically held that a defendant who violates § 1589(b) is subject to civil liability as a perpetrator:

> The physicians allege that PAHO committed a financial crime in the U.S., *see* 18 U.S.C. § 1589(b), and press the corresponding civil claim, *see* 18 U.S.C. § 1595(a) ("individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator ... and may recover damages").

*Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 716 (D.C. Cir. 2022) (omission in original); *see also Bistline v. Parker*, 918 F.3d 849, 873 (10th Cir. 2019) (§1589 holds not just primary offenders accountable but also anybody who knowingly benefits under § 1589(b)). Likewise, the First Circuit, in an opinion by Justice Souter, held that civil liability attached to attempts to violate § 1589 (including § 1589(b)): "The defendants at the least attempted to violate §§ 1589, 1590, and 1591 (see Claims 1, 2, and 3), the necessary substantial steps including the harboring of Ricchio and the receipt of benefit." *Ricchio v. McLean*, 853 F.3d 553,

557 (1st Cir. 2017); *see also id.* at 558 (the various TVPRA provisions do not require a showing of success in "establishing a going business in supplying third parties" to state a civil claim because, *inter alia*, § 1594 prohibits attempts to violate § 1589). District courts have approved civil claims pleading attempts or conspiracy (which also relies on § 1594) to benefit from forced labor. *See Baldia v. RN Express Staffing Registry,* 633 F. Supp. 3d. 693, 711 (S.D.N.Y 2022) (conspiracy to benefit); *Paguirigan v. Prompt Nursing Emp. Agency*, 286 F. Supp. 3d 430, 439-40 (E.D.N.Y. 2017) (Plaintiff stated claim under § 1589(b) and for § 1594 attempt of that provision); *Saraswat v. Selva Jayaraman Business Integra*, 2016 WL 5408115, at *3-6 (E.D.N.Y. Sept. 28, 2016) (defendants coerced plaintiff into looking for employment that would financially benefit them). Other district courts have approved civil claims pled directly under the beneficiary provision of § 1589(b), which indisputably permits attempt liability. *See Norambuena v. W. Iowa Tech Cmty. Coll.,* 2022 WL 987946, at *8 (N.D. Iowa Mar. 31, 2022) ("§ 1589(b) provides what is known as the 'beneficiary' theory of liability"); *Sherman v. Trinity Teen Sols.,* 2021 WL 7286424, at *6 (D. Wyo. Nov. 30, 2021); *Gilbert v. U.S. Olympic Comm.,* 423 F. Supp. 3d 1112, 1131 (D. Colo. 2019) (denying motion to dismiss claim for beneficiary liability pled under § 1589(b)); *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1164 (D. Kan. 2018); *see also A.B. v. Marriott*

*Int'l, Inc.*, 455 F. Supp. 3d 171, 192 (E.D. Pa. 2020) (a perpetrator can be a direct violator or a participant in a venture).

Plaintiffs argued, consistent with this authority, that therefore a person who attempts to violate § 1589(b) is subject to civil liability. In Plaintiffs' view, the belts-and-suspenders inclusion of additional "beneficiary" liability in § 1595 did not negate the imposition of "beneficiary" liability in § 1589(b) as a basis for civil liability. "Redundancies across statutes are not unusual." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992); *see also Barton v. Barr,* 140 S. Ct. 1442, 1453 (2020) ("[R]edundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication.").

This Court disagreed, holding that "we cannot read the word 'attempt' into the 'knowingly benefits' portion of § 1595." *Ratha*, 35 F.4th at 1176. Because § 1595 imposes civil liability on both a person who violates the substantive provisions of the TVPRA (including § 1589(b)) and, in addition, in a separate clause, "whoever knowingly benefits," this Court concluded that Congress made a conscious choice not to permit a civil action against those who attempt (or conspire, which is subject to the same analysis) to benefit from forced labor. *Id.* This Court explained, "had Congress intended to create liability under § 1595 for

attempts to benefit, we can reasonably conclude that it would have done so in express terms." *Id*. In its amended opinion, the Court clarified that it was not opining on criminal liability under § 1589(b), demonstrating that it saw § 1595(a)'s benefit clause as the exclusive means to hold a beneficiary civilly liable. *See id*. at n. 17.[4]

Defendants conceded the statute was ambiguous: "To be sure, the TVPRA, and particularly the interplay between its criminal provisions and the civil remedy may not be a model of clarity." Defs-Appellees' Resp to Petition for Rehearing en Banc, at 9 (Dkt. 103).

ii.    Unanimous Congressional response

Congress reacted almost immediately. In the very first reauthorization after this Court issued its opinion, Congress added the words this Court had identified as missing to eliminate the ambiguity, correct this Court's ruling, and make clear that attempt liability was intended to be available for both criminal and civil actions. *Supra* p.5. Congress intentionally provided that the statute was "clarifying and technical" to avoid unintended consequences on existing cases and to preserve a possible path for these Plaintiffs, concerns raised by advocates. Martina E.

---

[4] This Court also noted that "because § 1594(a) creates liability for an attempt to violate some of the TVPRA's substantive provisions, the term "perpetrator," as used in § 1595(a), could be read to include those who have only attempted to violate the TVPRA." *Id*., at n.16. Indeed, "could be read" indicates some acknowledgment of ambiguity.

Vandenberg & Maggie Lee, *Congress Amends the TVPRA to Correct Ninth Circuit's Erroneous Ruling in Ratha,* Transnational Litigation Blog, (Aug. 1, 2023), https://tlblog.org/congress-amends-the-tvpra-to-correct-ninth-circuits-erroneous-ruling-in-ratha ("Congress shared our concerns and agreed with the proposed clarifying amendment to make clear that, since 2008, the TVPRA has included attempt and conspiracy civil liability and that the panel decision was wrongly decided.").

Congress enacted the ATRA to correct *Ratha* and to clarify Congress' intent to permit civil liability over attempts and conspiracies to benefit from forced labor, removing any ambiguity that resulted from the redundancy in the complex statute's interlocking structure.

First, Congress expressly stated in the text of the amendment itself that it was enacting a "technical and clarifying" amendment, intentionally using the terms courts have repeatedly found sufficient to demonstrate that an amendment was intended to be clarifying and retroactive.[5]  Courts have found Congress' statement of its intent to be the most significant factor in determining when an amendment is clarifying: "Most significant to our determination here, Congress formally declared

---

[5] A statement in the statute's text is "entitled to great weight in statutory construction." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118, n.13 (1980).

in the titles of the relevant subsections of MMA that the amendments of MSP were 'clarifying' and 'technical.'" *Brown*, 374 F.3d at 259; *see also Piamba Cortes*, 177 F.3d at 1284 ("courts may rely upon a declaration by the enacting body that its intent is to clarify"); *Beverly Cmty. Hosp. Ass'n*, 132 F.3d at 1266 (use of term "clarification" in title is entitled to "great weight"); *U.S. v. Contreras*, 895 F.2d 1241, 1244 (9th Cir. 1990); *Johnson v. HUD*, 911 F.2d 1302, 1310–11 (8th Cir. 1990); *U.S. v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 741 (8th Cir. 1986) (Congress itself expressly characterized the 1984 amendments as "clarifying" amendments); *Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.*, 99 F. Supp. 2d 1123, 1133 (E.D. Cal. 2000) (use of the term "clarification" in statute's text is "strong evidence"). This Court should, as in *Crow*, "honor Congress' clarification label and accept [the amendment] as a statement of what the statute meant all along." 781 F.3d at 1101 (internal quotation marks omitted).

Second, the amendment was enacted soon after controversy arose over the interpretation of "attempt" liability. *Ratha* was the first to hold that civil liability did not extend to attempts to benefit. Shortly after the Ninth Circuit's ruling and at the very next opportunity – the reauthorization of the TVPRA scheduled for floor consideration in December – Congress clarified that "attempt" applied to beneficiary liability. Courts find that an amendment is clarifying when it follows "fast upon" a wrongly decided case or the discovery of an ambiguity. *See, e.g.*,

31

*Callejas v. McMahon*, 750 F.2d 729, 731 (9th Cir. 1984); *see also McCoy v. Chase Manhattan Bank, USA, Nat'l Ass'n*, 654 F.3d 971, 974 (9th Cir. 2011); *Liquilux*, 979 F.2d at 890. Courts find that the most logical explanation is Congress determined the case was wrongly decided and "acted to correct it." *Wesson v. U.S.*, 48 F.3d 894, 901 (5th Cir. 1995); *ABKCO Music*, 217 F.3d at 691; *Montgomery Cnty.*, 761 F.2d at 1003; Norman & Shambie Singer, *1A Sutherland Statutes and Statutory Construction* § 22:31 (7th ed. 2022 update). Indeed, here Congress expressly inserted the words this Court identified as "missing" from the text, which demonstrates that Congress was acting in response to *Ratha*'s misinterpretation of Congressional intent. *Supra* pp.5, 28; Vandenberg & Lee, *Supra* p.30.

Finally, the context also supports a finding that the amendment was intended to make clear the statute's original intent. Numerous anti-trafficking organizations, including the largest alliance of anti-trafficking advocates, organizations that assist police and prosecutors, and non-profits working with survivors of sex trafficking, filed an amicus brief in support of en banc review of *Ratha*. Amicus Br. of Human and Workers' Rights Organizations, *Ratha*, 35 F.4th 1159 (Dkt. 97). The amici argued that this Court's ruling on "attempt" undermined the choices made by Congress by eliminating the civil remedy where the government interdicted the goods made with forced labor, arrested perpetrators before the benefit was achieved, or otherwise disrupted a trafficking enterprise, concluding the panel

decision "undoes the choices made by Congress." *Id.* at 9. After the Court denied

en banc review, advocates asked Congress to amend the statute to clarify its intent,

which Congress did. Vandenberg & Lee, *supra* p.30 (noting "Ratha is precisely the

type of case that Congress sought to reach with its 2008 amendments" and

explaining "a group of advocacy organizations discussed the misinterpretation with

members of Congress, their staffs, and executive branch officials—alerting them to

the potential impact of the decision"). The clarifying provision passed without a

single vote in opposition. Courts find this context to be "precisely the sort of 'more

convincing evidence,'" that indicates a statute is intended as a clarification. *Brown

v. Marquette Sav. & Loan Ass'n*, 686 F.2d 608, 615 (7th Cir. 1982).

> iii.   The district court erred in holding that ATRA was not
>        clarifying

The Supreme Court stressed in *Landgraf* that Congress has "responsibility

for fundamental policy judgments concerning the proper temporal reach of

statutes" and recognized the importance of "giving legislators a predictable

background rule against which to legislate." *Id*. at 273. Congress here intentionally

and specifically used in the title of the amendment the terms recognized by the

circuit courts as sufficient to show that the amendment is intended to clarify

existing law. The lower court misinterpreted *Beaver* when it decided to disregard

this clear statement. 1-ER-7. In *Beaver*, the text of the statute was at best

ambiguous: Congress inserted a delayed effective date, which made the

amendment expressly *prospective*, notwithstanding the inclusion of the word "clarify" within a long title. 816 F.3d at 1187. Second, an examination of the legislative history revealed Congress had enacted the amendment in response to changes in economic and business conditions, not to correct a wrong decision. *Id*. Third, the interpretation of the term "lot" had been settled for decades and used by both courts and the Executive. The amendment did not follow "fast upon" a wrongly decided case or the discovery of an ambiguity. *Id.* at 1186. The lower court also observed that the TVPRA civil remedy was originally enacted in 2003 and that the extraterritoriality and beneficiary liability amendments were added in 2008 – and that these enactments are not retroactive. 1-ER-7. But it simply does not follow, as the lower court erroneously concluded, that a totally different amendment with different text and different Congressional intent cannot be clarifying. Finally, the lower court relied on the fact that ATRA lacks an effective date. Courts, including in this Circuit, have found many statutes without an effective date to be clarifying. *E.g. Crow,* 781 F.3d at 1095; *McCoy*, 654 F.3d at 971; *Callejas*, 750 F.2d at 729.

       c.      The district court erred by alternatively holding that *Plaut v. Spendthrift Farm* prohibits retrospective application of the ATRA to this case

In a footnote, the lower court alternatively held that applying ATRA here runs afoul of *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995). 1-ER-7. This

was also error. *Plaut* says only that Congress may not *command* a court to reopen a final judgment, and the lower court's holding conflicts with this Court's precedent, which holds that a retroactively applicable statutory amendment can be reason to vacate judgment.

In *Plaut*, the Supreme Court addressed the constitutionality of Section 476 of the FDIC Improvement Act of 1991, in which Congress directed that a discrete group of federal securities-fraud cases "shall be reinstated on motion by the plaintiff." 514 U.S. at 214-15. The Supreme Court held that Congress could not "*command[]* the federal courts to reopen final judgments." *Id.* at 219 (emphasis added).

*Plaut* did not hold, as the district court suggested, that a clarifying statutory amendment may not serve as a basis to reopen a final judgment under Rule 60(b)(6) on a court's own discretion and in view of the other equities and prerequisites for such a motion. To the contrary, the Supreme Court expressly *distinguished* Rule 60(b)(6) from the congressional command issued in Section 476 by noting that Rule 60(b)(6) preserves "the courts' own inherent and discretionary power" to set aside a judgment. *Id.* at 233-34 (quoting *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 244 (1944)). Thus, unlike the "legislative instruction to reopen," a motion under Rule 60(b)(6) does not "impinge[] upon the independent constitutional authority of the courts." *Id.*

35

This Court, sitting en banc, has elaborated upon this distinction:

> In a nutshell, Congress may change the law and, in light of changes in the law or facts, a *court* may decide in its discretion to reopen and set aside a consent decree under Fed.R.Civ.P. 60(b), or refuse to enforce an executory decree pursuant to its inherent power, but *Congress* may not *direct* a court to do so with respect to a final judgment (whether or not based on consent) without running afoul of the separation of powers doctrine.

*Taylor v. U.S.*, 181 F.3d 1017, 1024 (9th Cir. 1999) (en banc).[6]

The posture here is exactly the scenario the en banc Court found permissible under *Plaut*. The ATRA does not purport to compel any court to reopen a final judgment in this or any other case. Instead, Congress clarified the law and, in light of that clarification and the other surrounding equities, Plaintiffs asked the district court to exercise its discretion and set aside the final judgment. The district court erred in concluding it was powerless to do so.

The district court did not address *Taylor*, 1-ER-7, although the Plaintiffs cited it below. Rather, the district court observed that a retroactively applicable amendment applies to pending cases. *Id.* (citing *ABKCO Music,* 217 F.3d at 689). But *ABKCO Music* holds only that a clarifying statutory amendment *must* be

---

[6] While only a plurality of the en banc panel joined this portion of the *Taylor* opinion, the dissent expressed a similar view of *Plaut*'s limits. *See* 181 F.3d at 1037 (Wardlaw, J., dissenting) ("In *Plaut,* the Court distinguished between a district court's discretionary power to set aside a judgment pursuant to Federal Rule of Civil Procedure 60(b), the procedural mechanism at issue in *Rufo,* and Congress' attempt to require that a judgment be set aside.").

applied to pending cases. *See* 217 F.3d at 689; *see also, e.g.*, *Bank Markazi v. Peterson*, 578 U.S. 212, 229 (2016). It does not imply the converse. Rather, this Court holds that it is indeed within a trial court's discretion to reopen a final judgment under Rule 60(b)(6) to apply a retroactively applicable statutory amendment. *See U.S. v. Wyle (In re. Pac. Far E. Lines, Inc.)*, 889 F.2d 242, 250 (9th Cir. 1989) (affirming 60(b)(6) relief grant in light of recently enacted statute). *Wyle* predates *Plaut*, but *Plaut* did not abrogate it, and *Taylor* has since reinforced *Wyle*. *Plaut* does not bar relief here.

2. **The district court erred as a matter of law by holding that its legally erroneous alternative holdings independently supported the judgment**

The district court additionally held that the first and fifth *Phelps* factors weighed against relief because it concluded that the judgment in favor of Rubicon "is fully supported" by two other grounds that the district court articulated in its summary judgment opinion and that were not directly affected by the ATRA: (1) that Plaintiffs failed to show Rubicon participated in a venture and (2) that Rubicon could not have known the Factory Defendants were employing forced labor.

Plaintiffs challenged both these rulings in their prior appeal, but this Court did not reach them. Accordingly, as Rubicon acknowledged below (Dkt. 246 at 10, n.3), the district court's rulings did not become law of the case. *See, e.g.*, *Snapp v. United Transp. Union*, 889 F.3d 1088, 1096 (9th Cir. 2018); *Allstate Ins. Co. v.*

*Breeden*, 216 F. App'x 655, 660 (9th Cir. 2007) (law of the case did not preclude consideration of issues not reached in prior appeal). And because they are incorrect as a matter of law, the rulings cannot support the district court's denial of the Plaintiffs' Rule 60(b)(6) motion. *See Yniques v. Cabral*, 985 F.2d 1031, 1034 (9th Cir. 1993).

        a.    The legal basis for the district court's decision that Rubicon did not "participate" in a venture was incorrect

The district court rested its decision to deny 60(b) relief on its erroneous 2017 holding that Plaintiffs were required to show that each defendant "took some action to operate or manage the venture" in order to establish "participation" under the TVPRA. 1-ER-6 (citing Dkt. 226). That 2017 decision, which improperly grafted RICO's "operate or manage" standard onto the TVPRA, is an outlier that does not withstand scrutiny. It is inconsistent with the statute's text, has been criticized by other courts, and the Tenth Circuit in 2019 overturned the sole opinion that the lower court here had followed, leaving the lower court's 2017 decision standing alone in its misinterpretation of what it means to "participate" in a venture.

The TVPRA is "a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims." *Roe v. Howard*, 917 F.3d 229, 242 (4th Cir. 2019). "Congress settled on the current approach to private remedies against

38

human trafficking only after its 'understanding of the problem evolved' through years of studying 'how to best craft a response.'" *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1940 (2021) (Thomas, J., citing Br. for Members of Congress as Amici Curiae at 9, 13). For example, in one of the earliest Congressional hearings, Congress heard from Undersecretary of State Frank Loy, who explained that the origins of trafficking "are economic" and recommended providing a private civil remedy. *International Trafficking in Women and Children: Hearing Before the Subcomm. On Near E. & S. Asian Aff. of the S. Comm. on Foreign Rel.*, 106th Cong. 10-11, 15 (2000). Congress also heard from the Justice Department, whose representative advocated reaching individuals trafficked into migrant labor or sweatshop labor, and emphasized that Congress "must create the tools to prosecute those who knowingly profit from the forced labor of persons held in unlawfully exploited labor conditions." *Id*. at 78 (statement of William Yeomans, Chief of Staff, Civil Rights Division, Dep't of Justice). The Justice Department also recommended enacting a provision that targeted the economic beneficiaries of slave labor. *Id*. at 80; *see also The Global Fight to End Modern Slavery: Hearing Before the S. Comm. on Foreign Rel.,* 115th Cong. 4 (2018) (statement of Sen. Menendez) ("We have to hold businesses accountable when forced labor is discovered in their supply chains"). Congress provided survivors with the ability to bring civil suits against the persons who benefit, financially or by receiving

anything of value, from participation in ventures that have engaged in forced labor. See Statutory Addendum at SA-5; *see also* 154 Cong. Rec. S4799 (daily ed. May 22, 2008) (statement of Sen. Biden on introduction of TVPRA reauthorization) ("traffickers capitalize on the victims' desire to seek a better life, and trap them with lifetime debt bondages that degrade and destroy their lives…Finally, we establish some powerful new legal tools, including increasing the jurisdiction of the courts, enhancing penalties for trafficking offenses, punishing those who profit from trafficked labor…).

As the Supreme Court has explained, Congress uses the term "participate" when it intends "terms and concepts of breadth." *E.g.*, *Negusie v. Holder*, 555 U.S. 511, 544 (2009); *Russello v. U.S.*, 464 U.S. 16, 21 (1983); *see also Negusie,* 555 U.S. at 544 (adopting dictionary definition of participate: "to take part in something").

Consistent with the text and history of the statute, courts have found a wide range of conduct constitutes "participating in a venture." *See, e.g.*, *G.G. v. Salesforce.com, Inc.*, 2023 WL 4944015, at *13 (7th Cir. Aug. 3, 2023) (long term contractual relationship providing software support addressed to business needs sufficient for participation in venture); *Burrell v. Staff*, 60 F.4th 25, 39 (3d Cir. 2023) (private corporation and Lackawanna County participated in a venture when they became parties to a contract providing work-release prisoners from county

40

prison to recycling plant); *PAHO*, 29 F.4th 706, 710, 717 (D.C. Cir. 2021) (acting as a financial intermediary – moving money, for a fee – constitutes participation); *Bistline*, 918 F.3d at 849 (providing legal services constitutes participation; law firm drafted Trust documents and interviewed and organized team of defense lawyers); *Ricchio*, 853 F.3d at 555 (motel owner participated by "receiving money as rent"); *Maslic v. ISM Vuzem d.o.o.*, 2021 WL 5415261, *6 (N.D. Cal. Nov. 19, 2021). The "participation in a venture" element is met here. Rubicon plainly "took part" in the venture.

As an initial matter, two threshold issues are undisputed. First, it is undisputed that the venture engaged in forced labor. Rubicon did not dispute that sufficient evidence supported the claims of four Plaintiffs that they were subjected to forced labor to produce seafood for export to the United States. *Supra* p.6. Defendants did not move for summary judgment on these Plaintiffs' claims that they were subject to forced labor, peonage, and human trafficking.

Second, the district court adopted the dictionary definition of venture. 1-ER-15 (quoting *Bistline v. Jeffs*, 2017 WL 108039 (D. Utah Jan. 11, 2017) ("an undertaking that involves risk … a speculative commercial enterprise")). Neither party challenged the use of the dictionary definition and the district court assumed there was a venture. 1-ER-15. There is no genuine dispute that Rubicon undertook to sell shrimp produced by Phatthana in the United States – a classic commercial

venture. *See, e.g.*, 5-ER-959-960 ("Q. And Rubicon Resources helps the PTN Group and its factories sell its products in the United States; is that correct? A. Yes."); 6-ER-1230 ("packers created Rubicon Resources for the purpose of marketing and distributing their seafood products in the United States, and are partners in that enterprise."); 6-ER-1360.

The district court erred, however, when it concluded that Rubicon did not "participate" in the venture. Rubicon was founded to play a key role in the venture and its participation was crucial to the venture's success. *Supra* pp.9-11. Rubicon coordinated all aspects of shrimp sales in the United States. *Supra* pp.9-11. Rubicon marketed to and obtained contracts with large supermarket chains that the venture partners could not obtain on their own. *Supra* p.10. Rubicon even ensured that the Thai factories had an acceptable supply of raw shrimp that met U.S. standards and invested in 150 shrimp farms to do so. *Supra* p.10.

Rubicon forecasted demand, conducted market research, planned for fluctuating inventory, and filled orders. *Id.* ("Thai packers have no need to perform activities such as sales forecasting, market research, and the development of new packaging for their U.S. affiliate, because Rubicon Resources performs these services"). The members of the venture only made money when Rubicon sold their seafood to U.S. customers. *Supra* p.10.

42

For years, Rubicon worked closely with Phatthana, including on-site visits to supervise audits and quality control – Rubicon cherry-picked the auditor and helped conduct "pre-audits." *Supra* pp.10-11; 6-ER-1260 ("Gertrude will come for the audit and will work with me to get you approved"). Rubicon arranged for trainings of Phatthana staff after poor audit scores were received. *Supra* p.11. Rubicon also dealt with U.S. customs requirements, including serving as Phatthana's registered FDA agent. *Id.*

Correspondence between Rubicon and Phatthana managers demonstrated a high level of involvement in Phatthana operations, including in labor issues. *Supra* p.11; *see also* 3-ER-452-454; 6-ER-1277 (discuss ethical standards); 6-ER-1295; 6-ER-1297 (inquiry regarding worker documents); 6-ER-1332 (directions regarding language of pay stubs).

Rubicon also handled press and public relations, including taking a leading role in coordinating Phatthana's response to the forced labor allegations to protect the venture. *Supra* p.12; *see also* 6-ER-1310 ("this is where our Creative/Legal should spring into action"); 6-ER-1307 ("once we draft a uniformed response statement we will forward it to you"). Rubicon conducted a coordinated campaign to manage the bad publicity, including preparing talking points, drafting letters, and managing relationships with customers, industry groups, and the United

Nations – even attending international meetings regarding the forced labor allegations. *Supra* pp.11-12.

This conduct and level of involvement exceeds the participation found sufficient by a wide range of courts. *See, e.g.*, *Salesforce.com*, 2023 WL 4944015, at *13 (selling software solutions); *PAHO*, 29 F.4th at 717 (transferring funds); *Bistline*, 918 F.3d at 873, 876 (providing legal services); *Ricchio*, 853 F.3d at 555 (renting motel room).

As noted above, the lower court's conclusion that Rubicon did not "participate" in the venture rests on its erroneous grafting of RICO's "operate or manage" test onto the TVPRA. But RICO's text is different from the TVPRA. *See* 18 U.S.C. § 1962(c) (prohibiting participation "in the conduct of" an enterprise's affairs). The Supreme Court made clear that it was the word "conduct" that "requires an element of direction," while "participate" means simply to "take part in" and is, standing alone, a broad term. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993); *Negusie*, 555 U.S. at 544. Congress did not use the terms "in the conduct of an enterprise" or "operate or manage" in the TVPRA. Moreover, Congress was not trying to replicate RICO, as it had previously separately added forced labor to the RICO statute in 2004 so liability for "operating or managing" a forced-labor enterprise already existed in that differently worded statute. Pub. L. No. 108-193.

The lower court relied on one case, *Bistline v. Jeffs*, 2017 WL 108039 (D. Utah Jan. 11, 2017), as support for the "operate or manage" standard. But the Tenth Circuit overturned that decision and followed *Ricchio*, 853 F.3d at 555, instead. *Bistline*, 918 F.3d at 873. No court has adopted the lower court's decision and others have criticized it. *E.g.*, *Gilbert*, 423 F. Supp. 3d 1112 at 1138. The lower court also cited an unpublished case, *U.S. v. Afyare*, 632 Fed. App'x 272, 286 (6th Cir. 2016), involving a different provision of the TVPRA. *Afyare* did not use the "operate or manage" test, but required the government to prove an "overt act" that furthered the sex trafficking aspect of the charged venture to establish criminal liability over gang member defendants. Courts have rejected *Afyare*'s "overt act" requirement as inconsistent with the TVPRA's civil remedy. *E.g.*, *Bistline*, 918 F.3d at 873, 876 (law firm defendant not required to operate or manage the alleged forced labor); *A.R. v Wyndham Hotels & Resorts*, 2022 WL 17741054, at *6 (S.D. Ohio Dec. 16, 2022) ("participation in venture" does not require actual knowledge of trafficking crimes nor an "overt act"); *E.S. v. Best W. Int'l*, 510 F. Supp. 3d 420, 427 (N.D. Tex. 2021) (Plaintiff is not required to establish an overt act in furtherance of or actual participation in sex trafficking); *Wang v. Gold Mantis Constr. Decoration*, 2021 WL 2065398, at *6 (D.N. Mar. I. May 24, 2021); *A.B. v. Marriott Int'l*, 455 F. Supp. 3d 171, 191 (E.D. Pa. 2020) (*Afyare* inapplicable in civil cases); *Gilbert*, 423 F. Supp. 3d at 1137–38 (nothing

requires that defendant's "participation" be an overt act in furtherance of the other member's TVPA violation). As the Seventh Circuit recently held, the "venture" need not be a trafficking venture and participant liability does not require direct participation in trafficking. *Salesforce.com*, 2023 WL 4944015, at *1, 12.

Because Rubicon plainly "took part" in the venture to sell shrimp in the United States, the district court's adoption of the wrong legal standard cannot support its denial of 60(b) relief.

      b.     The district court erred by drawing inferences against the plaintiffs and otherwise improperly discounting their substantial summary-judgment evidence regarding Rubicon's knowledge and notice of forced labor

On summary judgment, the district court erred as a matter of law by drawing inferences against the Plaintiffs, improperly discounting their evidence, and relying on immaterial facts. Plaintiffs brought claims against Rubicon for benefiting from forced labor under both § 1589(b) and under § 1595(a)'s benefitting clause. The parties and the district court agreed that "knew or should have known" was the appropriate civil standard (1-ER-16; Dkt. 146 at 14; Dkt. 159 at 12), though Plaintiffs also argued and showed facts sufficient for "reckless disregard." When viewed, as it must be, in the light most favorable to Plaintiffs, the evidence presented should have precluded summary judgment.

"Should have known" is a negligence standard. *Marmolejo-Campos v. Holder*, 558 F.3d 903, 912 (9th Cir. 2009); *Swinton v. Potomac Corp.*, 270 F.3d

794, 803 (9th Cir. 2001). In a variety of contexts, courts have looked to "red flags" to determine whether a party "should have known." *E.g.*, *Rosenbloom v. Pyott*, 765 F.3d 1137, 1151 (9th Cir. 2014); *GO Comput. v. Microsoft Corp.*, 508 F.3d 170, 172 (4th Cir. 2007); *see also Salesforce.com*, 2023 WL 4944015, at *7 (defendant should have known venture engaged in trafficking from news coverage).

To act recklessly is "to 'consciously disregard[ ]' a substantial risk that the conduct will cause harm to another." *Voisine v. U.S.*, 579 U.S. 686, 691 (2016); *Farmer v. Brennan*, 511 U.S. 825, 838 (1994) (discussing objective civil standard). A corporation acts with "reckless disregard" when it, for example, fails to investigate after being alerted to possible risks or allegations of illegal activity. *See, e.g.*, *Hardeman v. Monsanto Co.*, 997 F.3d 941, 973 (9th Cir. 2021) ("downplaying concerns and failing to fully assess Roundup's safety after being alerted to possible risks" is sufficient evidence that defendant acted with "reckless disregard"); *Friedman v. Live Nation Merch.*, 833 F.3d 1180, 1186 (9th Cir. 2016) (forms did not include appropriate fields despite knowledge of risk).

"Knowing" requires knowledge of the facts that constitute the offense, not knowledge of unlawfulness. *E.g., Dixon v. U.S.*, 548 U.S. 1, 5 (2006). A fact finder may conclude that a party has constructive knowledge from newspaper reports and other widespread publicity. *E.g.*, *O'Connor v. Boeing N. Am.,* 311 F.3d 1139, 1152 (9th Cir. 2002); *United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir.

1980). A factfinder may conclude that a person knew of a risk from the fact that the risk was obvious. *E.g., Farmer*, 511 U.S. at 842.

Questions involving a person's state of mind are textbook jury questions generally inappropriate for summary judgment. *See Friedman,* 833 F.3d at 1186; *O'Connor*, 311 F.3d at 1152; *Braxton-Secret v. A.H. Robins Co*., 769 F.2d 528, 531 (9th Cir. 1985); 10A Charles A. Wright, Arthur R. Miller & Mary Kane, *Federal Practice and Procedure* § 2729 (4th ed. 2023 update) (Summary judgment particularly inappropriate "when an issue exists as to the willfulness of defendant's conduct or as to whether defendant knew or should have known ..."). Summary judgment can be granted "only if all reasonable inferences defeat the plaintiff's claims … The moving party's burden is therefore a heavy one." *SEC v. Seaboard Corp*., 677 F.2d 1297, 1298-99 (9th Cir. 1982) (internal citations omitted). In part, this is because state of mind must almost always be proved by circumstantial evidence and often relies on credibility determinations, which is a jury function. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) ("Outright admissions" of state of mind are infrequent: "plaintiffs often must rely upon other evidence"); *Hardeman*, 997 F.3d at 971; *Int'l Shortstop v. Rally's*, 939 F.2d 1257, 1265-66 (5th Cir. 1991); *U.S. v. Oswald*, 441 F.2d 44, 47 (9th Cir. 1971); Wright, Miller & Kane, *supra*, § 2730.

        i.    Ample evidence demonstrates Rubicon had the requisite
              state of mind

It is undisputed that Rubicon attempted to sell the shrimp in question to

Walmart from at least July to September 2012. *Supra* p.13.

Most strikingly, Rubicon did not dispute on summary judgment that it was

"alerted to" allegations of "worker issues" in February 2012. 6-ER-1374. Plaintiffs

presented evidence that in January 2012, Plaintiff Ratha told the Phnom Penh Post

that he was subject to forced labor, including that he and "hundreds of Cambodians

at Phatthana Frozen Food Factory wanted to leave but were unable to get their

passports back." *Supra* p.14. Reports concerning the allegations, including reports

that specifically named Phatthana, were circulated among top Rubicon managers

between February and April 2012. *Supra* p.14; *see also* 7-ER-1564 (Rubicon staff

comments "Not positive PR!" when circulating article reporting "Four employees,

all of who wish to remain anonymous, and former employee Keo Ratha have now

told the Post that most of the 1,000 workers want to leave but are waiting for the

company to answer their requests for their passports back"); 7-ER-1565-1566

(Rubicon staff comments "OUCH…" when circulating editorial stating "officials

charged with law enforcement and protection of victims too often ignore violations

and try to smooth over problems or cover them up …The serious charge that

Phattana Seafood seized workers' documents to keep them from quitting were

countered by promises to return them later this week."). On the prior appeal and

based on the same evidence, this Court assumed without deciding that Rubicon's co-defendant, Wales & Co. Universe, Ltd., gained *actual knowledge* of the forced labor violations when Ratha's allegations were published on February 23, 2012. *Ratha*, 35 F.4th at 1180. The court ultimately did not need to reach the issue because it found no evidence that Wales benefitted from the venture after that date. Given the undisputed evidence that Rubicon continued to participate in the venture well after all the allegations came to light, a jury can and should infer that Rubicon knew about – or at least should have known or recklessly disregarded – information that workers were subjected to forced labor at Phatthana's factory when it attempted to benefit from the venture.

Moreover, ample additional evidence from January 2012 through September 2012 shows summary judgment should not have been granted to Rubicon.

For example, in April 2012, an industry consultant reported to Rubicon managers that debt bondage was "probably the most significant issue" at Phatthana and "warrants serious investigation." *Supra* p.14. In April and May, Human Rights Watch contacted Walmart – which was in communication with Rubicon (9-ER-2116) – to raise concerns about debt bondage and passport taking at Phatthana. *Supra* pp.14-15. Also in May, a local Thai University wrote a report, produced from Defendants' files, that confirmed passport confiscation and harsh treatment of workers who attempted to flee. *Id.*; 7-ER-1578-1579 ("All workers at Phatthana"

had passports confiscated and "When running away, workers reported being arrested and put in prison").

In June 2012, the United Nations hosted a summit to discuss forced labor in the Thai seafood industry – including specifically at Phatthana – that was attended by a Rubicon manager. *Supra* p.15. He reported back to other Rubicon managers that Phatthana was highlighted as a bad example, including for passport withholding: "it was Rubicon and PTN as the target" and the U.N. moderator "beat the trafficking drum and document seizure over and over." 6-ER-1312. He added that Phatthana's CEO "needs help understanding the national and international impact of his problems." 6-ER-1313.

Finally, Plaintiffs presented evidence that after Walmart rejected Rubicon's shrimp *specifically because of concerns about Phatthana's labor violations*, Rubicon continued to try to convince Walmart to accept the delivery. *Supra* p.13. In other words, Rubicon continued to attempt to benefit even after Walmart flagged the forced labor concerns.

A reasonable jury could have easily concluded from this evidence that Rubicon knew, should have known, or recklessly disregarded Phatthana's use of forced labor. The broader context adds to the strength of this inference. Plaintiffs presented substantial evidence that Rubicon was well-aware there were widespread problems with forced labor and human trafficking of migrant workers in the Thai

seafood industry. *Supra* pp.8-9, 13-19. The State Department, NGOs, industry groups and the media reported on these issues, flagging that Cambodian migrants were vulnerable to forced labor in the shrimp-processing industry, recruitment practices in the industry included debt bondage, and employers withheld travel documents and work permits, trapping their workers. These indicia of trafficking were well known and widely reported. *Id.* For example, the Department of Labor publishes a list – the "Dirty Goods List" – of goods produced with forced labor. Shrimp produced in Thailand has been listed since 2009. *Supra* p.8. The AFL-CIO published a report on human trafficking in the Thai shrimp industry that specifically discussed problems involving Phatthana – albeit at a different factory. 4-ER-709; 8-ER-1836. Rubicon was aware of this reporting. *Supra* p.16. Rubicon's CEO additionally testified that he spoke to his own customers who expressed concern about labor issues in the supply chain. *Supra* pp.12-13.[7]

Rubicon executives visited Thailand, including the Songkhla factory, where they had the opportunity to speak to workers and observe the risk factors. *Supra* p.11. In addition, Rubicon worked closely with Phatthana for years, supervising

---

[7] In the prior appeal, this court found that this evidence was insufficient to show Wales's knew or should have known about Phatthana's violations *before* Ratha's allegations became public on February 23, 2012. *Ratha*, 35 F.4th at 1179. But when viewed alongside Ratha's allegations, it adds crucial context that strengthens the inference that Rubicon should have known the allegations were credible.

quality control, performing pre-audits, and arranging for staff training. *Supra* pp.10-11. The staff communicated frequently by email and phone. *Supra* p.11. Rubicon's awareness of the country-specific, industry-specific, and Phatthana-specific reports, combined with site visits and direct communication, at the very least raise the inference that Rubicon should have known that Plaintiff Ratha's allegations were credible.

In addition, Phatthana did not dispute its knowledge below. Phatthana's chief was one of four directors and shareholders of Rubicon, so his knowledge may be imputed to Rubicon. 5-ER-876; 5-ER-884 (directors actively engaged in management of Rubicon); *Funk v. Tifft*, 515 F.2d 23, 26 n.4 (9th Cir. 1975). At a minimum, this evidence creates a genuine issue of material fact.

> ii.    The district court erred in holding Plaintiffs lack evidence on Rubicon's state of mind

The district court improperly discounted this evidence by drawing inferences against the nonmovant Plaintiffs and focusing on immaterial facts. The district court primarily rested its decision on its conclusion that Rubicon "reasonably relied on industry and government audits and certifications" to ensure that Phatthana was not engaged in labor violations. But Plaintiffs adduced substantial evidence from which a jury could conclude that Rubicon's reliance on these audits and certifications was *not* reasonable. Indeed, the record shows that there were ***no*** audits during the relevant time that covered debt bondage, adult forced labor, or

human trafficking. *Supra* p.17. To the contrary, Rubicon's CEO testified that he could not recall anything Rubicon did to prevent problems with labor recruitment and management at Phatthana's factory. *E.g.*, 6-ER-1165 ("Q. Did you have a company executive assigned to antitrafficking efforts? A. Not to my knowledge"); 6-ER-1176. This is undisputed. 6-ER-1386. Rubicon's CEO also testified that he could not recall if Rubicon ever asked Phatthana to certify that there was no forced labor in its supply chain and could not recall any risk assessments that looked into forced labor. 6-ER-1158-1159.

Rubicon conducted one audit in the relevant time period – but this was a routine audit of plant-wide operations covering just six labor-related questions (out of roughly 197): whether employees were given a handbook containing pay and vacation information, paid minimum wage, worked a six-day week, eligible for overtime pay, and over 18. 3-ER-327. The audit was not done in response to the forced labor allegations and it plainly did not cover debt bondage, passport withholding, or other indicia of forced labor. *Supra* p.17. Defendants' argument to the contrary is refuted by the documents themselves and a jury could so find. Press reports, stakeholder organizations, and the U.S. Embassy all cautioned that these types of audits were insufficient to evaluate supply-chain labor problems. *Id.* Plaintiffs also submitted expert reports, including from Ambassador deBaca, the former Ambassador-at-Large to Monitor and Combat Trafficking in Persons,

describing standards for investigating human-trafficking allegations. *Supra* p.17-18.[8]

Nor do the Thai government investigations into Phatthana's labor practices render Rubicon's inaction reasonable as a matter of law. One of the investigations the district court cited confirmed labor violations, including that Phatthana had withheld workers' passports with "wrongfulness," illegally deducted workers' wages to pay the labor-broker fees, and violated labor laws. *Supra* pp.18-19. Although the investigation concluded Phatthana had not violated *Thai* antitrafficking laws, Rubicon executives conceded that Phatthana escaped further scrutiny because "Thai law is very weak or nonexistent." *Supra* p.17. This investigation undoubtably put Rubicon on notice of key aspects of Phatthana's forced-labor violations, whether Rubicon understood its illegality under U.S. law or not. *Dixon,* 548 U.S. at 5.

---

[8] Although the Court in the prior appeal discounted Ambassador deBaca's report, it did so only because Ambassador deBaca focused on the adequacy of the investigations after February 23, 2012, at which point the Court assumed Wales & Co., a co-defendant and former member of Rubicon, had actual knowledge of Phatthana's violations, though it neither benefitted nor attempted to benefit in that period. Because Rubicon indisputably attempted to benefit from Phatthana's violations as late as September 2012, Ambassador deBaca's report is plainly relevant to Rubicon's state of mind at that time. The Court did not have the opportunity to consider it on the prior appeal for this purpose because it did not reach the issue.

Furthermore, it is undisputed that, as Rubicon knew, the U.S. State Department repeatedly documented that Thai law enforcement was inadequately trained in identifying trafficking and plagued by corruption. *Supra* pp.17-18. These problems were well known. *Supra* p.14 (Thai press criticism of lax Phatthana investigation circulated among Rubicon executives); *see also Grynberg v. Total S.A.*, 538 F.3d 1336, 1349 (10th Cir. 2008) ("[B]usiness people can be expected to check public information."). Indeed, these concerns animated Congress' passage of the TVPRA. *E.g.,* 22 U.S.C. § 7101(12) (finding official corruption overseas hinders enforcement).

Plaintiffs' expert, Ambassador deBaca, opined that these investigations failed to meet basic international standards for investigating human-trafficking offenses. He characterized one investigation as "a rushed inquiry with insufficient interpreters," which consisted of five-minute interviews "largely used to confirm that the workers' identities matched their employment documents." 4-ER-721. Indeed, the police commander in charge of the investigation testified that he did not see the workers' living conditions and he would have conducted a fuller investigation if he had. 9-ER-2060. The other investigation was conducted "without a Khmer interpreter" and included interviews with an improperly small sample size of workers who had appeared to be coached. 4-ER-721.

The district court also cited a Cambodian "investigation," which appears to refer to a visit by the Cambodian Ambassador who spent an hour addressing 500 workers, urged them to work hard, avoid HIV, and "raised the experience" of a labor dispute at another factory where the workers were imprisoned—which is reasonably viewed as a threat, not an investigation, as Ambassador deBaca explained. 4-ER-721-722.

The district court's conclusions concerning reasonable reliance misapply the summary-judgment standard. *Eid v. Alaska Airlines*, 621 F.3d 858, 868 (9th Cir. 2010). On summary judgment, the district court was required to draw all inferences in Plaintiffs' favor. And the well-documented problems with these audits and investigations could easily lead a jury to conclude Rubicon's reliance was unreasonable.

None of the other reasons the district court articulated for granting summary judgment on the issue of Rubicon's knowledge can support the judgment.

The district court concluded that the evidence demonstrated Rubicon "sought to source product from companies that did not exploit their workers." 1-ER-16. But Rubicon's aspirations are irrelevant if it nevertheless knew Phatthana's shrimp was produced with forced labor when they attempted to benefit from its sale. The district court also concluded that there was no evidence that Rubicon was involved in Phatthana's labor recruitment or the working conditions at its factory.

57

*Id*. But the TVPRA does not require direction or participation in the principal violations. *See, e.g.*, *Salesforce.com*, 2023 WL 4944015, at *12 (participant liability does not require direct participation in trafficking). And, regardless, Rubicon's involvement *vel non* with the Phatthana's employment practices does not negate its knowledge of the violations that it gained through other sources.

Finally, citing an incomplete snippet of testimony, the district court concluded that "Rubicon returned the product it had purchased from Phatthana's factory after the allegations of worker exploitation were made public." 1-ER-16. But the record shows that ***Walmart*** – not Rubicon – rejected the shrimp due to Walmart's concerns about forced labor. *Supra* p.13. In fact, it is undisputed that even after Walmart informed Rubicon that it would not accept the shrimp because of its concerns over forced labor, Rubicon attempted to get Walmart to change its mind and accept the sale. *Id.* When these efforts failed, Rubicon did return the shrimp, but a reasonable jury could conclude it only did so because *the shrimp was in Walmart's branded packaging*. 3-ER-384 (Rubicon CEO: sale to another customer was "impossible"). Thus, far from absolving Rubicon, Walmart's rejection of the shrimp provides further evidence that Rubicon attempted to benefit from Plaintiffs' forced labor while it had full knowledge of the allegations lodged against Phatthana.

**B.      The Court should remand with instructions to vacate the judgment**

No doubt can remain that the judgment must be vacated. Indeed, the district court acknowledged that the second, third, and fourth *Phelps* factors, which are unaffected by its errors, are all either neutral or favor relief. *See* 1-ER-8. With the district court's errors corrected, the remaining two *Phelps* factors also favor Plaintiffs. Moreover, "all of the relevant circumstances" and the interests of justice "in light of all the facts" likewise weigh in favor of relief. *Henson*, 943 F.3d at 440.

Under *Phelps*, "appellate courts may, in their discretion, decide the merits of [the] motion in the first instance on appeal." *Phelps*, 569 F.3d at 1134-35 (citing *Gonzalez v. Crosby*, 545 U.S. 524, 536-38 (2005)). The Court should do so here in the interest of efficiency and judicial economy.

The first *Phelps* factor considers the nature of the legal change, including whether it involves "the resolution of unsettled law, or a 'remarkable—if limited' development in relevant settled law." *Bynoe*, 966 F.3d at 983 (internal citations and emphasis omitted). Relatedly, the fifth *Phelps* factor "asks whether the challenged judgment has a close relationship to the change in law underlying the Rule 60(b)(6) motion." *Id.* at 986. When the change in law "may have affected the outcome of the judgment," this factor warrants relief. *Id.*

The first *Phelps* factor is satisfied here. *Wyle*, 889 F.2d at 250; *see also Bynoe*, 966 F.3d at 983-84; *Phelps*, 569 F.3d at 1139. Congress enacted the ATRA

to remove any ambiguity that resulted from the redundancy in the complex statute's interlocking structure and to correct this Court's opinion, the first to hold that civil liability did not extend to attempts or conspiracies to benefit from forced labor. *Supra* pp.26-30. The fifth factor is satisfied as the challenged judgment has a close relationship to the newly enacted statute. *E.g., Venoco*, 2022 WL1090947 at *2. In addition, as discussed above, the ATRA "may have affected" the outcome of this case. Rubicon conceded it attempted to sell the shrimp, which falls squarely within the ATRA. *Supra* pp.5, 12-13. The lower court's alternative judgment on Rubicon's participation in a venture and state of mind are erroneous as a matter of law. *See supra* pp.37-58. Thus, even if the district court had granted summary judgment on these bases (had the ATRA's clarifying language been in effect), this Court would have reached these issues on the prior appeal and reversed the district court's alternative holdings.

As the district court found below, the remaining *Phelps* factors are either neutral or favor relief. 1-ER-8.

The second *Phelps* factor asks whether the movants "exhibited sufficient diligence." *Bynoe*, 966 F.3d at 984. Plaintiffs raised their attempt-to-benefit argument in opposition to Rubicon's motion for summary judgment, on the prior appeal, and in their petition for en banc rehearing of this Court's prior decision,

which this Court has found sufficiently diligent to favor relief. *See Bynoe*, 966 F.3d at 985; *Phelps*, 569 F.3d at 1136. The district court agreed. 1-ER-8.

The third *Phelps* factor concerns reliance on the judgment. *Phelps*, 569 F.3d at 1137. To weigh against relief, this factor requires something more than a party's "abstract interest in finality." *Henson*, 943 F.3d at 451. Rather, this Court has looked for circumstances akin to a final judgment conveying land to a party who thereafter makes improvements upon it. *See Phelps*, 569 F.3d at 1137-38. The district court found that "[t]he Judgment in this case did not cause any reliance interest," leading it to conclude "that the third factor is, at best, neutral." 1-ER-8.

The fourth *Phelps* factor requires "a degree of promptness." 569 F.3d at 1138. When a 60(b)(6) motion is premised on a change of law, timeliness is measured from the time a party has grounds to move. *See Bynoe*, 966 F.3d at 980. Otherwise, the relevant date is "when any appeal of [the judgment] became final." *Henson*, 943 F.3d at 452. Here, the plaintiffs filed their Rule 60(b)(6) motion less than two weeks after President Biden signed the ATRA, which was less than eight months after this Court issued its mandate. This short period weighs in favor of relief. *See Bynoe*, 966 F.3d at 986; *Phelps*, 569 F.3d at 1138. The lower court agreed. 1-ER-8.

# VIII. **CONCLUSION**

The court should reverse the district court's order and remand with instructions to vacate the judgment entered in favor of Rubicon.


Respectfully Submitted,


Dated:   August 14, 2023                /s/ Agnieszka M. Fryszman
                                                          Agnieszka M. Fryszman

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-55299

I am the attorney or self-represented party.

**This brief contains** 13,873 **words,** including ___ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated ___.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Agnieszka M. Fryszman **Date** 08/14/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

# STATUTORY ADDENDUM

## Contents

| Tab | Page |
|---|---|
| 1. 18 U.S.C. § 1589 | SA-1 |
| 2. 18 U.S.C. § 1594 | SA-3 |
| 3. 18 U.S.C. § 1595 (2008) | SA-5 |
| 4. 18 U.S.C. § 1595 (2023) | SA-6 |
| 5. PL 117-347 Sec. 102 | SA-7 |

**Effective: December 23, 2008**

18 U.S.C.A. § 1589

§ 1589. Forced labor

**(a)** Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--

**(1)** by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

**(2)** by means of serious harm or threats of serious harm to that person or another person;

**(3)** by means of the abuse or threatened abuse of law or legal process; or

**(4)** by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

**(b)** Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

**(c)** In this section:

**(1)** The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

**(2)** The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the

same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

**(d)** Whoever violates this section shall be fined under this title, imprisoned not more than 20 years, or both. If death results from a violation of this section, or if the violation includes kidnaping, an attempt to kidnap, aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title, imprisoned for any term of years or life, or both.

**Effective: December 23, 2008 to May 28, 2015**

18 U.S.C.A. § 1594

§ 1594. General provisions

**(a)** Whoever attempts to violate <u>section 1581</u>, <u>1583</u>, <u>1584</u>, <u>1589</u>, <u>1590</u>, or <u>1591</u> shall be punishable in the same manner as a completed violation of that section.

**(b)** Whoever conspires with another to violate <u>section 1581</u>, <u>1583</u>, <u>1589</u>, <u>1590</u>, or <u>1592</u>shall be punished in the same manner as a completed violation of such section.

**(c)** Whoever conspires with another to violate <u>section 1591</u> shall be fined under this title, imprisoned for any term of years or for life, or both.

**(d)** The court, in imposing sentence on any person convicted of a violation of this chapter, shall order, in addition to any other sentence imposed and irrespective of any provision of State law, that such person shall forfeit to the United States--

**(1)** such person's interest in any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of such violation; and

**(2)** any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation.

**(e)(1)** The following shall be subject to forfeiture to the United States and no property right shall exist in them:

**(A)** Any property, real or personal, used or intended to be used to commit or to facilitate the commission of any violation of this chapter.

**(B)** Any property, real or personal, which constitutes or is derived from proceeds traceable to any violation of this chapter.

**(2)** The provisions of chapter 46 of this title relating to civil forfeitures shall extend to any seizure or civil forfeiture under this subsection.

**(f) Witness protection.**--Any violation of this chapter shall be considered an organized criminal activity or other serious offense for the purposes of application of chapter 224 (relating to witness protection).

**Effective: December 23, 2008 to May 28, 2015**

18 U.S.C.A. § 1595

§ 1595. Civil remedy

**(a)** An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

**(b)(1)** Any civil action filed under this section shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.

**(2)** In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.

**(c)** No action may be maintained under this section unless it is commenced not later than 10 years after the cause of action arose.

SA-5

**Effective: January 5, 2023 to Present**

18 U.S.C.A. § 1595

§ 1595. Civil remedy

**(a)** An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

**(b)(1)** Any civil action filed under subsection (a) shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.

**(2)** In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.

**(c)** No action may be maintained under subsection (a) unless it is commenced not later than the later of--
**(1)** 10 years after the cause of action arose; or
**(2)** 10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense.

**(d)** In any case in which the attorney general of a State has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by any person who violates section 1591, the attorney general of the State, as parens patriae, may bring a civil action against such person on behalf of the residents of the State in an appropriate district court of the United States to obtain appropriate relief.

**Effective: January 5, 2023 to Present**

PL 117-347 Sec. 102

18 U.S.C.A. § 1595. Civil remedy

SEC. 102. TECHNICAL AND CLARIFYING UPDATE TO CIVIL REMEDY.

Section 1595(a) of title 18, United States Code, is amended by inserting "or attempts or conspires to benefit," after "whoever knowingly benefits,".